# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan Humphrey Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3357 | **DATE** | 8/6/2002 |
| **CASE TITLE** | Randall A. Beach vs. Commonwealth Edison Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Commonwealth Edison Company's motion for summary judgment is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 4 number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | AUG - 8 2002 date docketed | 38 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 8/8/2002 date mailed notice | |
| WAP | courtroom deputy's initials | 02 AUG -8 PM 4:12 Date/time received in central Clerk's Office | WAP mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RANDALL A. BEACH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 00 C 3357 |
| ) | Judge Joan H. Lefkow |
| COMMONWEALTH EDISON ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Defendant, Commonwealth Edison Company ("ComEd"), has moved for summary judgment on the single-count complaint of plaintiff, Randall A. Beach ("Beach"), which alleges that ComEd, his former employer, breached its fiduciary duty under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), by making misrepresentations to Beach prior to his retirement about the potential availability of a retirement incentive plan. The court's jurisdiction is properly invoked under 28 U.S.C. § 1331 (federal question) in that the matter relates to an employee welfare benefit plan regulated under ERISA, and specifically under 29 U.S.C. § 1132(e)(1). For the reasons stated herein, the court denies the motion.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and

assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF[1]

Prior to his retirement from ComEd on June 20, 1997, Beach worked as a senior load dispatcher in the Transmission and Distribution ("T&D") Department at ComEd's Chicago Operations Dispatch facility.[2] In January 1997, at age 52, Beach began considering early retirement.[3] ComEd had offered 20 to 30 severance plans since 1994. In May 1997, Beach

---

[1] Citations to Beach's or ComEd's Local Rule 56.1 Statement of Facts are referred to herein as "Pl. L.R. 56.1 ¶ __" or "Def. L.R. 56.1 ¶ __," respectively.

[2] As a senior load dispatcher, Beach oversaw the equipment maintenance of the electrical system. (*See* Beach Dep. at 11, 12.)

[3] Around that time, Beach became eligible for an early retirement plan, but he did not participate. (Beach Dep. at 20-21.)

became aware of "rumors" that ComEd might offer a retirement incentive plan in the T&D Department. (Pl. L.R. 56.1 ¶ 6.) As such, although Beach signed his notice of intent to retire on May 12, he left his decision to retire open until June 19, 1997, his last day of employment with ComEd. (*Id.* ¶ 5.)

From February to June 1997, Beach would occasionally ask his supervisor, Wayne Thomas ("Thomas"), and several human resources representatives, namely, Mary Dybos ("Dybos"), Laura Williams ("Williams") and Tywayne Wilson ("Wilson"), whether ComEd was planning to offer a retirement incentive plan because, if it was, he would wait to retire so that he could participate in the plan. Specifically, Beach spoke with Thomas once in February and twice in May, Wilson on May 12, Williams on February 19, May 12 and May 16, and Dybos on June 16 or 17.

Each time that Beach spoke with these individuals, they told him that ComEd was not considering any retirement incentive plan and, if it was, the T&D Department would not be included. (Def. L.R. 56.1 ¶ 13.)[4] Beach asked them to keep him informed of any new developments. (Pl. L.R. 56.1 ¶ 6.) After repeatedly being assured that ComEd would not offer a retirement incentive plan, Beach retired on June 20, 1997 after over 31 years of employment with ComEd.

Only six weeks after Beach retired, however, on or about August 7, 1997, ComEd

---

[4]Specifically, Beach testifies in his deposition:

> ... [E]very time I asked, everybody said absolutely it's not going to happen. You're not going to get a package. The company is not going to offer your department a package. It just will not happen. That was the essence of everything I got. ...

(Pl. L.R. 56.1 ¶ 9.)

3

announced that it was offering a voluntary severance plan to eligible employees in the T&D Department known as the "Voluntary Separation Plan for Designated Transmission and Distribution Management Employees of Commonwealth Edison Company" or the "Plan." The Plan included severance pay, extended health care benefits, life insurance and education and out-placement assistance. To be eligible for participation, full-time management employees had to be actively employed with ComEd as of August 4, 1997 and be notified by ComEd of their eligibility in writing by August 15, 1997.

ComEd adopted the Plan as a result of its reorganization of the T&D Department, which began sometime in 1997. According to ComEd's "T&D Reorganization for Competition Final Report" (the "Report"), dated October 1997, and prepared by consultants to ComEd, Scott, Madden & Associates, a time line for the T&D reorganization was as follows: Project Planning completed in March 1997; Top Level Organization Design completed in early April 1997; and future T&D Organization completely designed and approved no later than June 4, 1997. (Pl. L.R. 56.1 ¶ 22; Pl. Ex. E.) The Report also included a memorandum entitled, "T&D Operations *Reorganization for Competition* Project Announcement," dated April 21, 1997, from McCoy to "T&D Operations Personnel[,]" (referred to herein as the "Memorandum"), in which McCoy announced that the T&D Department personnel will participate in

> . . . a project that will examine the current organization structure of T&D Operations, consider the rapidly approaching future industry environment, and recommend a design for T&D best suited for competition in such a future. . . . Reengineering the work currently performed and/or reducing staffing levels are *not* the goals of this project.

(Pl. Ex. E) (emphasis in original.)

However, as part of the reorganization, the T&D Department would have excess

4

personnel. Paul McCoy ("McCoy"), the Vice President of the T&D Department, asked Joe Krisch ("Krisch"), the Human Resources Manager for the T&D Department, to develop staffing recommendations and proposals on how to manage the excess personnel. (Pl. L.R. 56.1 ¶¶ 17-19; Def. L.R. 56.1 ¶ 18.) Approximately when McCoy contacted Krisch is unknown. Krisch then set up a meeting with Howard Nelson ("Nelson"), the Strategic Staffing Director, whose responsibility was to consult with Human Resources Managers, such as Krisch, "about the future work force needs [of the department (subject to its reorganization)] and [to] help[] them manage the movement of people in, around and out of the company to meet its business needs." (Nelson Dep. at 12-14.) In preparation for this meeting, Nelson gathered information on the needs of and personnel employed in the T&D Department but did not make any recommendations to Krisch until they met on or about July 22, 1997. (Def. L.R. 56.1 ¶ 21.)[5] From their meeting, Nelson started with a template based on prior severance plans to draft the Plan, and Krisch and Nelson eventually created the Plan in late July and early August. On August 6, 1997, McCoy approved the Plan. (*Id.* ¶ 25.)

Had he not retired a few weeks earlier, Beach would have been eligible to participate in the Plan. As such, after learning about the Plan, Beach wrote a letter, dated October 9, 1997, (referred to herein as the "1997 letter") to James O'Connor, Chairman of ComEd's parent company, requesting medical benefits under the Plan for his wife and himself. (*Id.* ¶ 31.) Beach's letter was forwarded to Nelson, who was also the Plan Administrator, who treated the letter as a claim for benefits. In a letter dated November 21, 1997, Nelson wrote to Beach

---

[5]Likewise, Krisch did not develop any recommendations until after he met with Nelson in late July 1997. (Def. L.R. 56.1 ¶ 22.)

5

denying the claim on the basis that Beach was ineligible to participate in the Plan because he was not on the payroll as of August 4, 1997. (*Id.* ¶ 34.) Nelson also informed Beach of his right to request a review of the claim denial to S. Gary Snodgrass ("Snodgrass"), a Vice President at ComEd. (*Id.* ¶ 35.) At that time, Beach did not request any review. (*Id.* ¶ 36.)

On December 6, 1999, Beach, by and through his attorney, submitted another letter to ComEd (referred to herein as the "1999 letter"), claiming benefits under the Plan. ComEd treated the 1999 letter as Beach's first claim for benefits, not knowing about the 1997 letter. (*Id.* ¶ 37.) ComEd denied Beach's claim (again) because Beach was ineligible to participate in the Plan as he was not on the payroll as of August 4, 1997 and informed Beach of his right to request a review of the claim denial to Snodgrass. This time, Beach appealed through ComEd's internal review process. After Beach received no response from ComEd concerning his appeal, Beach filed this instant action on or about June 2, 2000, alleging that ComEd breached its fiduciary duty by making misrepresentations to him that it was not considering a retirement incentive plan but then offering the Plan approximately six weeks after his retirement.

## DISCUSSION

ComEd argues that it is entitled to summary judgment because it did not breach its fiduciary duty for three independent reasons, namely, (1) it did not consider the Plan, seriously or otherwise, until one month after Beach retired; (2) Beach failed to exhaust his administrative remedies within the time frame set forth in the Plan; and (3) its decision to deny Beach benefits under the Plan was not arbitrary and capricious.

6

## A. ComEd's consideration of the Plan

ERISA is a comprehensive statute designed to protect employee benefit plans. In furtherance of its goals, the statute designates certain parties as plan fiduciaries, 29 U.S.C. § 1002(21). ERISA provides that these plan fiduciaries

> . . . shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

*Id.* at § 1104(a)(1)(B).[6] ERISA imposes personal liability on plan fiduciaries for any injury from a breach of their fiduciary duties. *Id.* at § 1109(a). It sets forth a variety of enforcement provisions describing the circumstances under which the Secretary of Labor, as well as plan participants, beneficiaries and fiduciaries, may initiate civil actions to redress violations under ERISA. *Id.* at § 1132.

A fiduciary has a duty to provide complete and accurate information in response to beneficiaries' questions as well as a duty to refrain from affirmative misrepresentations. *Adamczyk v. Lever Bros. Co.*, 33 F. Supp. 2d 679, 688 (N.D. Ill. 1998) ("*Adamczyk II*"). Moreover, these duties "cannot be circumvented by building a 'Chinese wall' around those employees on whom plan participants reasonably rely for important information and guidance about retirement." *Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993) ("*Fischer I*"). "There can be no claim, however, unless the misinformation provided or information omitted is material." *Adamczyk II*, 33 F. Supp. 2d at 688.

---

[6]ERISA also designates other persons as "parties in interest" and specifically prohibits plan fiduciaries from engaging in certain transactions with parties in interest. 29 U.S.C. § 1106.

7

The parties do not dispute that ComEd is a fiduciary. Instead, they dispute whether the alleged misrepresentations made by Thomas and the human resources representatives to Beach were material. ComEd asserts that the court should apply the "serious consideration" standard set forth by the Third Circuit in *Fischer I*, 994 F.2d at 135, *modified*, *Fischer II*, 96 F.3d 1533, 1549 (3d Cir. 1996) and adopted in *Adamczyk II*, 33 F. Supp. 2d at 688, to find that the evidence demonstrates Thomas and the human resources representatives made their statements before ComEd was "seriously considering" the Plan.[7] Beach responds that although the serious consideration standard "is a useful guide for certain fact scenarios it was not intended and should not be interpreted as having talismanic qualities enabling courts to use it under every circumstance and in every case." (Resp. at 8-9.) Rather, Beach urges the court to apply the "materiality" standard set forth by the Second Circuit in *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122 (2d Cir. 1997).

Although district courts in this Circuit generally apply the serious consideration standard, Beach's assertion that the court should apply *Ballone* based on the particular facts of this case has merit. *Accord Wayne v. Pacific Bell*, 238 F.3d 1048, 1051 (9th Cir. 2001) (applying "the *Bins* rule [(the serious consideration standard)] requiring honest answers to questions once serious

---

[7]Under the serious consideration standard,

> ... [i]nformation that an employer may offer termination incentives is not material until such incentives are under serious consideration. ... Thus, even if a termination is being considered and a member of management expressly denies that such consideration is taking place, this cannot be a basis for a claimed fiduciary violation if the pertinent discussions have not yet reached the level of serious consideration.

*Adamczyk II*, 33 F. Supp. at 688. Serious consideration of a new plan "exists when (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." *Id.*, quoting *Fischer II*, 96 F.3d at 1539. As to these three factors, they "are not isolated criteria; the three interact and coalesce to form a composite picture of serious consideration." *Fischer II*, 96 F.3d at 1539.

consideration had begun, and the *Ballone* rule against actively providing misinformation even prior to serious consideration"); *cf. Vartanian v. Monsanto Co.*, 131 F.3d 264, 269 (1st Cir. 1997) (stating, in dictum, "[w]e are not here presented with facts that suggest a deliberate attempt on [the defendant's] part to affirmatively mislead [the plaintiff], and therefore have no occasion to consider whether we would apply *Ballone* in an appropriate case"). Indeed, the Seventh Circuit has not specifically adopted or rejected either the serious consideration or *Ballone* "materiality" standard.[8]

Under the materiality standard, "where an ERISA fiduciary makes guarantees regarding future benefits that misrepresent present facts, the misrepresentations are material if they would induce a reasonable person to rely upon them." *Ballone*, 109 F.3d at 125. "[A]n employer's serious consideration of changes to a plan is but one aspect of the *materiality* of the alleged misrepresentations not a prerequisite to the fiduciary's *duty* to speak truthfully when making disclosures to plan beneficiaries." *Id.* at 123 (emphases in original). In determining the materiality of the alleged misrepresentations, the court also considers:

> [(2) how significantly the statement misrepresents the present status of internal deliberations; [(3)] the special trust and relationship between fiduciary and beneficiary; [(4)] whether the employee was aware, or should have been aware, of other information from the company that would lessen the importance of the

---

[8]The Seventh Circuit has given favorable treatment to both *Ballone* and *Fischer I*, which preceded the formulation of the "serious consideration" (*Fischer II*). *See Frahm v. Equitable Assurance Soc'y of the U.S.*, 137 F.3d 955, 961 (7th Cir. 1998) (citing *Ballone* and determining "[r]epresentations about plans and intentions could be false if, at the time the statements were made, the speaker actually had a different intention . . . ."); *Schmidt v. Sheet Metal Workers' Nat'l Pension Fund*, 128 F.3d 541, 547 (7th Cir. 1997) (citing *Fischer I* and determining the plaintiff had no evidence to suggest that the defendants had any involvement with misstatements made or were deliberately withholding information from the plaintiff). Nonetheless, the Seventh Circuit has neither adopted the specific holdings of *Fischer I, Fischer II* or *Ballone* nor indicated that it will adopt the serious consideration or materiality standard. *Accord Flanagan v. AllState Ins. Co.*, No. 01 C 1541, 2001 WL 1539138, at *2-3 (N.D. Ill. Nov. 30, 2001) ("[I]t is not clear how broadly [the Seventh Circuit] would apply the serious consideration reasoning if asked. . . . [However,] it is likely the Seventh Circuit will recognize some cause of action for breach of fiduciary duty when an ERISA plan amendment is under serious consideration.").

misstatement; and [(5)] the specificity of the statements.

See *Hudson v. Gen. Dynamics Corp.*, 118 F. Supp. 2d 226, 257 (D. Conn. 2000), citing *Ballone*.

Under *Ballone*, Beach contends that the statements made to him by Thomas and the human resources representatives were materially false because, although there were rumors of a possible severance plan, they told him that ComEd would not offer a retirement incentive plan for the T&D Department. Beach concludes that these statements suggest "to a reasonable person that ComEd had rejected [making] such an offer." (Resp. at 16.) Because Beach provides evidence that the T&D Department was undergoing a reorganization and ComEd offered 20 to 30 severance plans in the past but Thomas and the human resources representatives told Beach that ComEd would not be offering a retirement incentive plan, the court agrees with Beach that under the particular facts of this case, there is evidence of an affirmative misrepresentation. As such, the court will apply the *Ballone* "materiality" standard.

*1.    ComEd's serious consideration of the Plan*

Under the serious consideration factor, the undisputed evidence shows that ComEd did not seriously consider the Plan until sometime between July 22 and August 6, 1997, which is after Beach retired.

*2.    How significantly the statements misrepresented the present status of ComEd's internal deliberations / the specificity of the statements*

Beach argues ComEd "had, several weeks before [his] retirement date, completed but not published to its employees, a final reorganization plan for [the T&D] [D]epartment . . . [and] a document dated within three days of his departure catalogues the 172 jobs eliminated by the reorganization." (Resp. at 16.) Beach asserts that because ComEd never eliminated jobs without

10

offering a voluntary severance plan and because Nelson used a template to quickly create the Plan, "it hardly could be truthful to declare to Beach that [ComEd] would 'absolutely'" not offer a retirement incentive plan. (*Id.*)

As evidence of the final reorganization plan for the T&D Department, Beach points to the unauthenticated Report, prepared by consultants to ComEd, which is dated October 1997, approximately four months after Beach retired. The Report consists of information on the organizational structure of the old and new T&D Department, memorandums and spreadsheets with projected dates and power point presentations (mostly of them dated after Beach retired). The Report does not show exactly when ComEd completed the reorganization plan of the T&D Department and when it knew it would eliminate 172 jobs. However, the Memorandum in the Report indicates that ComEd knew it would reorganize the T&D Department prior to Beach's retirement. Although McCoy wrote that "reducing staffing levels" was not a goal of the reorganization, a trier of fact could reasonably infer from the organization charts included in the Report that ComEd knew it would have excess personnel subject to the T&D Department's reorganization. This inference is strengthened by the fact that ComEd had offered 20 to 30 severance plans during the previous three years.

Further, despite McCoy's announcement that the T&D Department would reorganize, Thomas and the named human resources representatives told Beach in May or June that a retirement incentive plan was "not going to happen," that Beach was "not going to get a package" or that if ComEd did offer such a plan, it would not be for the T&D Department. (Pl. L.R. 56.1 ¶ 9.) In *Ballone*, the court recognized that "[i]n most circumstances, an employee probably cannot rely upon a representation that the employer has decided never to alter its benefits package, for

11

example, because such a statement is too speculative and unbelievable to 'mislead a reasonable employee in making an adequately informed decision about if and when to retire." 109 F.3d at 125, quoting *Mullins v. Pfizer, Inc.*, 23 F.3d 663, 669 (2d Cir. 1994). And, corporate fiduciaries are not required to be "perfectly prescient" or "clairvoyant" about information. *Frahm v. Equitable Life Assurance Soc'y of the U.S.*, 137 F.3d 955, 960 (7th Cir. 1998). Because ComEd announced its reorganization of the T&D Department by April 21, 1997, and Beach asked that he be kept informed of any new developments, a trier of fact could reasonably determine that at least one statement - if ComEd did offer such a plan, it would not be for the T&D Department - is specific enough to mislead a reasonable employee in making an adequately informed decision about if and when to retire. This is particularly so where Beach insists that he would have postponed his retirement based on the possibility of a plan being offered. Likewise, the statements are sufficiently specific in that Thomas and the human resources representative conclusively stated that ComEd would not offer a retirement incentive plan for the T&D Department, even though it was likely that there would be one in light of the reorganization and given that ComEd had offered 20 to 30 severance plans in the past three years.[9] Although this evidence is not a "smoking gun," it is sufficient to raise an issue of fact as to whether Thomas and the human resources representatives misrepresented the present status of ComEd's internal deliberations.

3.  *The special trust and relationship between the fiduciary and beneficiary*

    In characterizing its fiduciary relationship with Beach, ComEd asserts that it was nothing

---

[9] As noted earlier, whether Thomas and the human resources representatives actually knew that they were making misrepresentations is immaterial. *See* discussion *supra* page 7, citing *Fischer I*, 994 F.3d at 135.

more than "the standard relationship that existed between those ComEd employees and any other participant or beneficiary of a ComEd benefit plan." (Reply at 9-10.) Beach, however, testifies that he asked Thomas and the human resources representatives about a future retirement incentive plan based on the rumors he heard in May that ComEd might offer one. Beach's trust in Thomas (his own supervisor) and the human resources representatives to tell him the truth was not unreasonable. *Cf. Hudson*, 118 F. Supp. at 257 ("while defendant extracted a concession from each plaintiff that they did not have a 'special relationship' with any of the benefits counselors, the Court believes that the evidence supports the existence of a type of special relationship, by form and title, where employees are directed to and channeled through specially designated employee benefits counselors, in order to receive crucial information about their benefits."). Thus, Beach establishes the existence of a relationship with ComEd that satisfies this factor.

4.  *Whether Beach was aware, or should have been aware, of other information from ComEd that would lessen the importance of the misrepresentations*

ComEd asserts that because Beach testified he had recently been eligible for a different early retirement plan and Nelson testified ComEd offered 20 to 30 severance plans during the past three years, the evidence shows that Beach was aware (or should have been aware) of other information tending to minimize the importance of the alleged misrepresentations to him. A reasonable trier of fact, however, could find that this information does not lessen the importance of the alleged misrepresentations made to Beach. Indeed, this information tends to increase the importance of the alleged misrepresentations because, in light of this information, Beach specifically went to and asked his own supervisor and the human resources representatives if

13

ComEd planned to offer a retirement incentive plan for the T&D Department. There is no evidence that Beach was aware or should have been aware of other information from ComEd that would lessen the importance of the alleged misrepresentations.

Viewing the evidence in the light most favorable to Beach, the court finds that Beach puts forward sufficient evidence to create a genuine issue of material fact concerning whether ComEd breached its fiduciary duty under ERISA. Although ComEd was not seriously considering the Plan until after Beach retired, a trier of fact could reasonably find that Thomas' and the human resources representatives' statements significantly misrepresented the status of ComEd's internal deliberations and were specific enough to mislead a reasonable employee, that Beach's trust in Thomas and the human resources representatives was not unreasonable, and that the existence of other information (such as that Beach previously was eligible for another retirement incentive plan and that ComEd offered 20 to 30 severance plans in the past three years) did not lessen but strengthened the importance of the alleged misrepresentations. As such, ComEd is not entitled to summary judgment on this ground.

**B.     The exhaustion of administrative remedies**

ComEd asserts that Beach did not properly exhaust his administrative remedies under the Plan because Beach failed to appeal to Snodgrass after Nelson rejected Beach's claim for benefits made in Beach's 1997 letter. Exhaustion of administrative remedies is not a jurisdictional requirement, but a judicially created doctrine. *Kross* v. *Western Elec. Co.*, 701 F.2d 1238, 1244 (7th Cir. 1983). The decision to require exhaustion is within the discretion of the trial court. *Lindemann* v. *Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir. 1996); *Powell* v. *A.T. & T. Communications, Inc.*, 938 F.2d 823, 825 (7th Cir. 1991). "As a general rule, an ERISA plaintiff

must exhaust all available administrative remedies, but the requirement is relaxed in two instances: when a plaintiff is denied meaningful access to administrative procedures and when exhaustion would prove futile." *Adamczyk v. Lever Bros. Co.*, 991 F. Supp. 931, 934 (N.D. Ill. 1997) ("*Adamczyk I*").

Beach points to his 1999 letter, sent by and through his attorneys, as his first and only claim for benefits the rejection of which he timely appealed. Alternatively, Beach contends that even if this court treated his 1997 letter as a claim for benefits, the court should excuse his failure to exhaust his administrative remedies. Beach relies on *Adamczyk I*, 991 F. Supp. at 934, which recognized that "[i]n exercising discretion, some courts in this district have refrained from requiring exhaustion under these circumstances [in breach of fiduciary duty cases.]"

Even if Beach's 1997 letter is a claim for benefits, the court excuses any failure on Beach's part to exhaust his administrative remedies. When Beach wrote his 1997 letter to ComEd, he acknowledged that he was not a participant of the Plan but offered his reasons why ComEd should grant him and his wife medical benefits. Nonetheless, according to the Plan requirements, Nelson rejected Beach's claim for benefits because Beach retired prior to August 4, 1997, the cut-off date. Indeed, in response to Beach's 1999 letter, in which his attorney even insisted that ComEd was in breach of its fiduciary duty, ComEd rejected his claim for benefits again for this same reason. Further, when Beach appealed this time to Snodgrass, ComEd did not respond to his request for a review of his denial of benefits. Thus, the court finds that even if Beach had filed a timely appeal from ComEd's denial of benefits in his 1997 letter, it is apparent that ComEd would not have decided any differently. Accordingly, ComEd is not entitled to summary judgment on this ground.

15

Because the court excuses Beach's failure to exhaust his administrative remedies as futile, the court need not consider ComEd's argument that summary judgment must be granted because its denial of benefits was not arbitrary and capricious.

## CONCLUSION

Wherefore, Commonwealth Edison Company's motion for summary judgment [#25-1] is denied.

ENTER: *Joan H. Lefkow*
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: August 6, 2002